**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | | |
|---|---|---|
| United States of America, | ) | No. CR 05-0505-PHX-NVW |
| Plaintiff, | ) ) | **ORDER** |
| vs. | ) ) | [Not for publication] |
| Raymond Parker, | ) ) | |
| Defendant. | ) ) ) | |

Before the court is Defendant's Motion to Suppress (doc. # 32), on which the court heard evidence and argument on January 10, 2006. Defendant is charged with Felon/Armed Career Criminal in Possession of a Firearm in violation of 18 U.S.C. § 922(g)(1) and 924(e). He moves to suppress the rifle seized from under his mattress in his home on October 31, 2004. The following are the court's findings of fact pursuant to Fed. R. Crim. P. 12(d) and conclusions of law on the motion, with additional discussion where appropriate.

**I.      Background.**

Flagstaff Police Officer Grant Kelly interviewed Laurice Villa-Vicencia in the early evening of Friday, October 30, 2004, at the Flagstaff Medical Center.    She was intoxicated and did not want to cooperate with the police. Eventually, she claimed that Defendant Raymond Parker, the father of her child, had assaulted her intermittently over the previous week. Her wounds were apparent. Ms. Villa-Vicencia also informed the police officer that

1  Mr. Parker had placed a rifle under the mattress in his bedroom. Mr. Parker was well known
2  to the Flagstaff police as a felon who could not lawfully possess a firearm.

3  Ms. Villa-Vicencia had an extensive criminal history involving substance offenses and
4  other matters, and her truthfulness was open to fair question. She was a transient with no
5  residence and no work. She stated that Mr. Parker was at a friend's house in Sunnyside and
6  that he would flee if he saw the police.

7  Officer Kelly did not seek a search warrant for the firearm but believed that he had
8  probable cause to arrest Mr. Parker for aggravated assault. He prepared a report, which
9  would be assigned to a detective the upcoming Monday. He also prepared an internal police
10 "attempt to locate," which was noted in the briefing of officers coming on shift Saturday
11 morning, October 31, 2004. The "attempt to locate" warned officers to arrest Mr. Parker if
12 they encountered him, but it did not require a search for him. The "attempt to locate" noted
13 that Mr. Parker possibly had a firearm. Officers on duty had discretion to affirmatively look
14 for him if consistent with their other shift duties. Some officers recognized Mr. Parker's
15 address at 113 E. Benton as a residence he shared with other persons.

16 At 8:37 a.m. that Saturday morning, the police radio dispatcher circulated a notice that
17 a 911 "hang-up call" had been received from 774-6005, the telephone number for 113 E.
18 Benton. She related that the phone number was immediately called back and someone
19 answered the phone but hung up without talking. (The dispatcher in question now has no
20 memory of these events.) According to usual procedure, police were dispatched to
21 investigate a possible emergency. The responding officers included Sergeant Frank Higgins
22 and Officers Jolene Coules and Erik Carlson. Upon arriving at 113 E. Benton, they directed
23 the dispatcher to call the number again, and they could hear a telephone ringing inside the
24 house. Officer Coules heard a muffled voice inside the house. After knocking and receiving
25 no response, they entered through an unlocked back door, announcing themselves as
26 Flagstaff police responding to a 911 call. They searched the house room by room and found
27 no one until they reached the last room, Mr. Parker's bedroom. Their search under and
28 behind the bed did not reveal anyone's presence. However, Sergeant Higgins noticed

movement under a blanket on the floor of the entrance to the closet and ordered the person out. It was Mr. Parker. As he lay prone, the police officers arrested and handcuffed him. Mr. Parker was angry and vocal about the warrantless entry into his home.

Mr. Parker lay handcuffed within an arm's reach of the bed, though he could not have reached the rifle because he was handcuffed. The officers removed the mattress, found a rifle, and removed it. While being transported for detention, Mr. Parker asked what number the 911 call came from and confirmed to Officer Carlson that 774-6005 was his phone number. He told Officer Carlson that he did not place a 911 call.

**II.     The 911 Hang-Up Call Was Not Planted.**

Mr. Parker argues that the entry and all its fruit are tainted because the 911 hang-up call was a police plant for the purpose of falsely authorizing an emergency entry. The foundation for this contention is Mr. Parker's hearsay statement to Officer Carlson that he did not make a 911 call. From that, Mr. Parker argues that one of the following must have happened:

1. the police dispatcher fabricated the incoming 911 call and attributed it to telephone number 774-6005, even though the absence of an incoming call would be apparent until the tapes were destroyed in due course after six months;
2. the police used electronic trickery to fake the 911 call as coming from number 774-6005 but in fact made it themselves from some other phone; or
3. the police entered Mr. Parker's house and made the phone call from his phone or they made the call by tapping into his phone line where it enters his house.

As circumstantial support for one of those alternatives, there is no specific basis in the record to think Mr. Parker would have made a 911 call that morning, nor would it be consistent with his general aversion to contact with the police. There was no other person in Mr. Parker's house when he was arrested, so one can infer that there probably was not another person in his house approximately twenty minutes earlier when the 911 hang-up call was placed.

The court must find that factual conclusion which is most likely under the fair weight of all the evidence, holding the Government to its burden of proof and burden of persuasion.

1  The court finds as most likely from this evidence that a 911 hang-up call was placed, that it
2  in fact came from number 774-6005, and therefore that it was made by someone at that
3  house, and not by policy trickery, whether electronic or trespassory.  Mr. Parker's hearsay
4  statement that he did not make the 911 hang-up call, if true, is compatible with someone else
5  in the house making the call and then promptly leaving the house, as it had other occupants.
6  Even excluding that possibility, if the court must judge the believability of Mr. Parker's
7  hearsay statement that he did not make the 911 hang-up call as against his speculations of
8  police fabrication or trickery, the court finds those speculations so attenuated that Mr.
9  Parker's hearsay denial of having made the 911 call is even less believable.  The court
10 therefore finds by a preponderance of the evidence that someone other than the Flagstaff
11 police made the 911 call from Mr. Parker's residence.

**III.    The Emergency Doctrine.**

*United States v. Cervantes* established the emergency doctrine, which, if applicable, permits a police officer to enter a residence without a warrant.  219 F.3d 882, 889 (9th Cir. 2000) ("We find justification for adopting the emergency doctrine, not under police officers' function as criminal investigators, but in their community caretaking functioon to respond to emergency situations.").  The doctrine requires (1) that the police have reasonable grounds to believe that there is an emergency at hand and an immediate need for their assistance for the protection of life or property, (2) that the search is not primarily motivated by an intent to arrest and seize evidence, and (3) that there is reasonable basis, approximating probable cause, to associate the emergency with the area or place to be searched.  *Id.* at 888-90.

The Government contends that the 911 hang-up call and its accompanying circumstances validated the warrantless entry under the emergency doctrine.

**A.    Reasonable Grounds.**

The 911 call was silent and therefore provided no articulated cause for concern for protection of life or property.  However, a 911 call is itself a call for assistance or protection in an emergency.  In addition, some corroborating evidence reinforced a conclusion that there may be an emergency situation occurring at 113 E. Benton.  First, the police officers knew

- 4 -

1  that one resident was wanted for arrest for aggravated assault occurring the previous week.
2  Second, Ms. Villa-Vicencia informed the police that an illegal firearm was located in the
3  residence. Third, as discussed below, the events following the initial 911 hang-up call did
4  not dispel the police officers' concern that an emergency was occurring at 113 E. Benton.

5  Some 911 hang-up calls are pranks and some reflect the caller's change of mind. A
6  call-back or a police visit often discloses such a case. However, in this case, the Flagstaff
7  Police's protocol of calling back did not dispel the force of that initial concern for safety from
8  the 911 call. In fact, the subsequent developments only raised the alarm that an emergency
9  may be occurring at 113 E. Benton. When the police first called back 774-6005, a person
10 answered the phone and immediately hung up without talking. While standing outside the
11 residence, the on-location officers asked dispatch to place a second call-back, which this time
12 went entirely unanswered. The refusal of the person in the house, known to be there by the
13 muffled voice, to answer the second call back at all or to respond to the police officers'
14 announced concern for a possible emergency left the natural emergency-indicating force of
15 the initial 911 hang-up call unabated and in fact enhanced. In these circumstances, the police
16 had reasonable grounds to believe that there was an emergency at hand and an immediate
17 need for their assistance for the protection of life or property.

18 There is no bright-line rule that any 911 call, much less a hang-up call, always justifies
19 a warrantless emergency entry to prevent harm. The circumstances matter. *See Kerman v.*
20 *City of New York*, 261 F.3d 229, 236 (2nd Cir. 2001) (anonymous 911 call alone was not
21 enough to justify a warrantless entry); *United States v. Meixner*, 128 F.Supp.2d 1070, 1075
22 (E.D. Mich. 2001) (concluding that warrantless entry was not justified under the emergency
23 doctrine when one resident was on the front lawn and the other resident was in clear view
24 through the window); *Thacker v. City of Columbus,* 328 F.3d 244, 255 (6th Cir. 2003)
25 (finding that the police were justified in their warrantless entry when the discussion between
26 the officers and the residents did not dispel the concern that someone may still be in danger
27 in the house).

28

- 5 -

### B. Primary Motive to Arrest and Seize Evidence.

Mr. Parker argues that because the Flagstaff police were looking to arrest Mr. Parker if they encountered him, the Government cannot satisfy the second element of *Cervantes*–that the entry not be primarily motivated to collect evidence, or by extension to make an arrest. The contours of this requirement are not entirely clear. In *Cervantes* the officer smelled an odor coming from an apartment that he recognized as associated with methamphetamine production, which is both illegal and explosive. The district court upheld the officer's warrantless entry because the court concluded that his purpose for entry was to protect occupants in neighboring apartments, even though the discovery of explosive chemicals and the discovery of a crime were one and the same. 219 F.3d at 891. The court of appeals emphasized the trial court's finding that there was no indication that the officer was "trying to make up a story afterwards to justify what he did." *Id.*

Here, the dispatcher decided, pursuant to standard policy, to investigate a 911 hang-up call from telephone number 774-6005. The Flagstaff police did not on their own decide to investigate the 911 hang-up. The court finds as a matter of fact that the entering officers were directly motivated by their authority and duty to investigate the unresolved 911 call, to which they could get no information short of entry, even though they were also aware that entry might result in arresting Mr. Parker if the police found him within.

### C. Association with the Area to be Searched.

*Cervantes* also requires that the police have a reasonable basis, approximating probable cause, to associate the emergency with the area or place to be searched. This requirement is easily satisfied. The emergency was associated with the area or place to be searched. The 911 call indicated an emergency wherever the call originated from, which was the residence located at 113 E. Benton. A person in need could be in any room in the house.

## IV. Scope of Search Incident to Arrest.

Mr. Parker argues that because he was handcuffed on the floor before the police removed his mattress and found the rifle, that search and seizure was excessive in scope and not justified by the emergency doctrine in any event. The scope of the search under the

- 6 -

emergency doctrine is only so far as needed to respond to the emergency. *Id.* at 891. After examining every room in the house and finding no person or property in danger, the removal of Mr. Parker's mattress after arresting and handcuffing him exceeded the scope of search under the emergency doctrine. Nevertheless, having been justified in entering the house at 113 E. Benton and having found Mr. Parker therein, whom they had probable cause to arrest for aggravated assault, the police were entitled upon that lawful arrest to a search incident to arrest.

"A legitimate search incident to arrest is limited to the arrestee's person and to the area within his immediate control, meaning the area from within which he might gain possession of a weapon or destructible evidence." *United States v. Hudson*, 100 F.3d 1409, 1419 (9th Cir. 1996) (citation and quotations omitted). The physical and temporal scope of the search are considered when evaluating the validity of the warrantless search. *Id.*

Mr. Parker argues that searching under the mattress was not within his "immediate control" because the fact that he was handcuffed and lying on the floor prevented him from being able to physically reach for the firearm. A police officer can handcuff and arrest a suspect, remove the suspect from the room, and then three minutes later conduct a search incident to arrest of the area that was in the suspect's "immediate control" at the time he was arrested. *See Id.* It does not matter that the suspect cannot physically reach for the gun because the police had handcuffed and moved him to a different room. *Id.* Here, the fact that the police officers handcuffed Mr. Parker so that he could not actually reach under the mattress is not dispositive. Thus, the mattress was still within Mr. Parker's "immediate control."

Concerning the temporal scope of the search, a "search incident to arrest must be conducted at about the same time as the arrest." *Id.* (citation and quotations omitted). There is no question that the search under Mr. Parker's mattress occurred "at about the same time as the arrest." The police officers searched under the mattress immediately after arresting and handcuffing Mr. Parker.

1  Therefore, the police officers' search under Mr. Parker's mattress was lawful under the
2  search incident to arrest exception.
3  IT IS THEREFORE ORDERED that Defendant's Motion to Suppress (doc. # 32) is
4  denied.
5  DATED this 20th day of January 2006.

_____
Neil V. Wake
United States District Judge